**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 26, 2015**

# In the Court of Appeals of Georgia

A14A1828. HUTCHINS v. COCHRAN, CHERRY, GIVENS,
 SMITH & SISTRUNK, P. C.

MCMILLIAN, Judge.

Markel Hutchins appeals following the trial court's grant of summary judgment to Cochran, Cherry, Givens, Smith & Sistrunk, P. C. (the "Cochran Firm") on Hutchins's claim for quantum meruit/unjust enrichment and for attorney fees connected to that claim.[1] We affirm in part and reverse in part for the reasons set forth below.

---

[1] The trial court also granted summary judgment to the Cochran Firm on Hutchins's claims for tortious interference with contractual or business relations, fraud, Georgia RICO violations, and related attorney fees, but Hutchins does not appeal the grant of summary judgment on those claims.

This case arises out of the fatal shooting of Kathryn Johnston on November 21, 2006 by undercover Atlanta Police Department ("APD") officers serving a no-knock warrant at Johnston's home. Johnston's estate (the "Estate") filed a lawsuit against the City of Atlanta (the "City"), the police chief, and several APD officers asserting claims, inter alia, for Johnston's wrongful death and pain and suffering (the "Lawsuit"). The suit was eventually settled in August 2010 for $4.9 million (the "Estate Settlement"), and the settlement checks were made payable in two installments to both the Estate's administrator, Sarah Dozier ("Dozier"), who was Johnston's niece, and the Cochran Firm. See *In re Estate of Johnston*, 318 Ga. App. 324, 324-325 (733 SE2d 856) (2012).[2]

Approximately one year after the Estate Settlement, Hutchins filed a petition for injunctive relief and damages against Dozier, individually and as administrator of the Estate; the Estate itself; and the Cochran Firm (collectively the "Defendants"), alleging that he had an oral agreement with Dozier to provide public relations and media-related services for the Estate and that he was entitled to compensation from

[2] In that case, Hutchins appealed the probate court's denial of his motion to set aside the discharge of the Estate's administrator and his motion for an accounting and return of Estate funds. This Court vacated the probate court's order and remanded for further proceedings consistent with the Court's opinion. *In re Estate of Johnston*, 318 Ga. App. at 329.

2

all the Defendants for public relations and media-related services he had performed in connection with the Lawsuit. The Defendants first moved to dismiss the petition, but the trial court denied that motion.[3]

Subsequently, in December 2012, Dozier passed away and Hutchins ultimately entered into a "Confidential Agreement of Settlement Release and Assignment of Claims and Causes of Action" with Dozier's estate, releasing all his claims against Dozier individually and as the administrator of the Estate (the "Dozier Settlement").

Following discovery, the Cochran Firm moved for summary judgment[4] on Hutchins's claims, asserting that the claim for quantum meruit/unjust enrichment failed because (1) Hutchins admitted that during the pendency of the Lawsuit, he had no expectation of payment from the Cochran Firm over and above that arising from his alleged oral agreement with Dozier to act as spokesperson for the Johnston and Dozier families; (2) the evidence showed that Hutchins conferred no benefit upon and performed no services for the Cochran Firm in relation to the Lawsuit; and (3)

[3] The Defendants sought an interlocutory appeal of that denial, which this Court initially granted but later dismissed as improvidently granted.

[4] The Cochran Firm filed a separate motion for summary judgment, which the trial court denied, asserting that because Hutchins failed to list his claims in this lawsuit in his bankruptcy petition, he was judicially estopped from further pursuing them. The trial court's ruling on that motion is not at issue in this appeal.

Hutchins was reasonably compensated for any services he performed in connection with the Estate Settlement when he accepted consideration for releasing his claims against Dozier. Following briefing and a hearing,[5] the trial court granted summary judgment without explaining its reasoning. Hutchins argues that the trial court erred in concluding that no genuine issue of material fact remained as to his claim of quantum meruit/unjust enrichment and that he is not entitled to recover attorney fees arising from that claim.

On appeal, "[w]e review de novo a trial court's grant of summary judgment, construing the evidence in a light most favorable to the nonmoving party." *Latson v. Boaz*, 278 Ga. 113 (598 SE2d 485) (2004). "To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judgment as a matter of law. OCGA § 9-11-56 (c)." Id. However, because the Cochran Firm would not bear the burden of proof at trial on the claim for quantum meruit, it must only "point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of [that claim]" in order to obtain summary judgment. (Citations omitted.) *Cowart v. Widener*, 287 Ga. 622, 623 (1) (a) (697 SE2d 779)

---

[5] The appellate record does not contain a transcript of this hearing.

4

(2010). If the Cochran Firm is able to carry that burden, Hutchins "cannot rest on [his] pleadings[] but rather must point to specific evidence giving rise to a triable issue" in order to survive summary judgment. (Citation and punctuation omitted.) Id.

Construing the evidence in favor of Hutchins, the record shows that since 1993, Hutchins "[has] concentrated [his] work in the area of public, media, and community relations, with an emphasis on social justice." In that regard, he established MRH, LLC ("MRH"), a consulting firm engaged in public affairs, public relations, crisis communication, inner city development, and management consulting.

On the night that Kathryn Johnston was killed by APD officers, Hutchins saw a woman he later learned was Dozier on television and observed that she appeared very upset. Concerned that the situation could lead to neighborhood unrest, or even violence, Hutchins got into his car and drove to the scene where he approached Dozier and offered to pray with her. She replied that if he really wanted to help, he could talk to the gathered media on behalf of the family. Dozier told Hutchins that the press had made her look like a fool and she would never talk to them again. At Dozier's request, Hutchins then gave a statement on the family's behalf. Dozier called him the next day and asked how much he would charge to be the family's media spokesperson. Hutchins told Dozier that he would accept ten percent of whatever the

family recovered in any civil lawsuit they filed arising out Johnston's death, and Dozier agreed to his terms.[6]

Additionally on the night of Johnston's shooting, Hutchins called attorney Hezekiah Sistrunk of the Cochran Firm from the scene of the incident to discuss the matter, and Hutchins subsequently referred Dozier to the Cochran Firm for legal representation. Hutchins understood that he had a pre-existing arrangement with Sistrunk, beginning with another high-profile case he referred to the Cochran Firm, that he would be paid for public relations, public affairs, crisis communication and related work he performed "specifically with the firm" in connection with the cases he referred. He based that understanding on Sistrunk's representation, on more than one occasion, that when a case was over the firm would "take care" of Hutchins.[7] When Sistrunk told Hutchins that the Cochran Firm would "take care" of him after

---

[6] Dozier never submitted to a deposition, but the testimony of Dozier's children disputes Hutchins's narrative of the development of his relationship with Dozier, and the children deny that Dozier entered into an agreement for Hutchins to act as family spokesperson for ten percent of the Lawsuit proceeds. Rather, they assert that Hutchins introduced himself as a representative of the Cochran Firm and a civil rights activist. At one point, Dozier signed an agreement with the Cochran Firm providing that anyone brought into the case (e.g., associated counsel) would be paid, and the family believed that Hutchins was being compensated under that agreement.

[7] He also stated that Tiffany Cochran, the firm's communication director, told him that Sistrunk "would be fair" to him.

the Johnston case was over, Hutchins understood this representation to mean that the Estate's pursuit of the Lawsuit was a team effort, with Hutchins and his associates "managing the public aspects of [the case] to support the civil position and the lawyers . . . taking care of the legal aspects of it."

However, Hutchins could not recall that he ever discussed with Sistrunk the amount of any compensation he would receive. And Hutchins never represented himself to the public as a consultant to the Cochran Firm or that he was "anything other than what I was:" "the spokesperson for the Estate of Kathryn Johnston, who is a civil rights activist, human rights activist, minister, consultant, [and] business owner."

Hutchins asserts he performed a number of services for the Cochran Firm, including attending meetings with public officials, giving interviews, coordinating press conferences and news coverage, organizing commemorative ceremonies and a march, and traveling to Washington, D.C. to speak with federal officials to encourage a federal investigation into the case. Although these services were performed primarily in connection with the criminal investigation of the officers involved in the Johnston shooting, Hutchins asserted that they helped "create[] an atmosphere among those officers and their attorneys that was conducive [to] the development of

evidence" in the Lawsuit. He took these actions with the intent to achieve a result that "would criminally predicate a strong civil position." Hutchins also states that through such actions he acted as a liaison between the media and the Cochran Firm. And "on each and every occasion," he asserts that he conferred with Cochran Firm attorneys to obtain their approval "for the actions and statements [he] made on behalf of the Johnston family and the claims and legal actions asserted against the City of Atlanta and others." Additionally, during the pendency of Lawsuit, Hutchins also asserts he kept public pressure on the City to resolve the case by holding press conferences, giving interviews, and hand-delivering a letter to City officials urging them to settle the case.

In contrast, the Cochran Firm attorneys[8] and employees assert that although Hutchins was "a friend of the firm," it never hired him as a consultant or expert or pre-approved his actions. Rather, Hutchins held himself out as the Johnston family's spokesperson, and the Cochran Firm viewed him as a community activist attempting to raise awareness of issues in the community and to promote himself. The firm's

---

[8] We note that although Cochran Firm quotes Sistrunk's deposition in its brief, that deposition transcript was neither a part of the appellate record nor apparently of the record in the trial court below, and thus we have not considered any such citations. Only the exhibits to Sistrunk's deposition are included in the record.

lawyers did not view Hutchins's actions as helping the litigation, although they may have been good for the community. In fact, the Cochran Firm lawyers and personnel stated that at times, some of the things Hutchins said were not helpful and he became a hindrance. For example, attorneys for the United States and the City expressed reservations about Hutchins's access to information, asking that he be excluded from attending certain meetings.

Hutchins admits that he did not attend the mediation or settlement negotiations between Cochran Firm lawyers and City attorneys that ultimately resulted in the Estate Settlement. In fact, he never spoke with any of the City attorneys in the civil case. And he could not recall any specific occasions when a Cochran Firm lawyer asked him for advice in connection with the Johnston case.

However, he testified that at the request of Jane Sams, one of the Cochran Firm attorneys, he wrote a letter expressing Dozier's thoughts on the days the officers were indicted on criminal charges, which Sams read at an April 26, 2007 news conference. And Sams stated that there were occasions when she asked Hutchins "as a favor" or "as a friend" to get statements from Dozier or to see if Dozier would speak to some of the attorneys involved. Sams explained that Dozier did not like to be bothered, and Hutchins saw her almost daily because his son was enrolled in Dozier's day care

9

center. Accordingly, "there were statements that either he drafted and [Dozier] may have authorized or [Sams] drafted it and he got [Dozier] to sign off on."

Additionally, Hutchins asserts that he worked on the wording of Cochran Firm press releases, particularly the firm's May 1, 2007 press release about a trip he made to Washington, D.C. to meet with federal officials. Further, Hutchins stated that Tiffany Cochran, who became the communications director for the Cochran Firm beginning in October 2007,[9] asked him to attend the press conference announcing the Estate Settlement in August 2010 because two of the lawyers who had worked on the case were out of town.[10] Hutchins recalled at least one benefit he provided to the firm at that news conference. When one of the Cochran Firm lawyers mistakenly referred to Johnston as a grandmother, Hutchins interjected to clarify that Johnston had never had children or grandchildren.

---

[9] Thus, the Cochran Firm asserts that it had no need of Hutchins's services as a media specialist or public relations consultant, because it already had the services of Tiffany Cochran.

[10] Tiffany Cochran stated, however, that she merely called Hutchins to inform him of the Estate Settlement because it would be rude not to call him, as he had been the family spokesperson. And Sams stated that the firm allowed Hutchins to participate in certain news conferences because he wanted to increase his public profile.

Hutchins testified that in connection with his work on the Johnston case, he received a $5,000 check from the Cochran Firm on April 24, 2007, and the firm wrote an additional $20,000 "retainer" check on July 9, 2008 to his consulting business, MRH. However, the Cochran Firm asserts that these payments were not made to compensate for any services performed by Hutchins but rather were paid for other reasons, including as a donation to Hutchins's campaign for Congress.[11]

1. In order for Hutchins to recover in quantum meruit, he must present evidence demonstrating that (1) his services were valuable to the Cochran Firm; (2) his services were either at the request of the Cochran Firm or knowingly accepted by it; (3) the Cochran Firm's receipt of the services without compensating Hutchins would be unjust; and (4) Hutchins expected compensation for his services at the time he provided them. *Amend v. 485 Properties*, 280 Ga. 327, 329 (627 SE2d 565) (2006); *Wallin v. Wallin*, 316 Ga. App. 455, 456 (1) (729 SE2d 567) (2012). However, "[t]he reasonable value which the provider is entitled to recover in quantum meruit is not the value of the labor but the value of the benefit resulting from such labor to the recipient." *Hollifield v. Monte Vista Biblical Gardens*, 251 Ga. App. 124, 130 (2) (b)

---

[11] Nevertheless, the record indicates that Sistrunk would have been the person who authorized any payments to Hutchins, and as previously noted, his deposition is not included in the appellate record.

(553 SE2d 662) (2001). See also *Wallin*, 316 Ga. App. at 456 (1). And "[t]he theory of unjust enrichment is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay." (Citation and punctuation omitted.) *Bedsole v. Action Outdoor Advertising JV, LLC*, 325 Ga. App. 194, 200 (3) (750 SE2d 445) (2013). See OCGA § 9-2-7 ("Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof.").

(a) To establish the first and second elements of his quantum meruit/unjust enrichment claim, Hutchins must present evidence that his services had value to the Cochran Firm and that the Cochran Firm requested or knowingly accepted his services. Hutchins asserts that he performed community actions, interacted with the media, and met with government officials, primarily in conjunction with the criminal investigation into Johnston's shooting, and that he continued this work during the pendency of the Lawsuit to keep pressure on the City to settle. Hutchins contends that such services contributed to an atmosphere that led to the successful resolution of the case. For example, Hutchins asserts that his meetings, conversations, and correspondence with the Fulton County District Attorney led the District Attorney to

12

accede to the Johnston's family's wishes that he work with federal authorities. Similarly, he contends that his trips to Washington, D.C. "solidified" the Justice Department's intervention into the case and his various press conferences and public events kept pressure on the City.

But Hutchins has failed to produce any evidence that his activities contributed to the Estate Settlement and thus had any value to the Cochran Firm. The only evidence that Hutchins's efforts led officials to make certain decisions or aided in resolving the Lawsuit comes from conclusory and self-serving testimony in his own affidavit and deposition. The record contains no evidence from any government official or anyone else indicating that Hutchins's efforts affected any decisions regarding the criminal investigation. And Hutchins admitted that he had no involvement in the prosecution of the Lawsuit or in the negotiations leading to the Estate Settlement, and thus he has no firsthand knowledge of the factors that played a role in the City's decision to settle. Moreover, the record contains no evidence from any City official, or anyone else, indicating that any actions by Hutchins created pressure or contributed to the City's settlement decision. Indeed, the evidence in the record, from Cochran Firm attorneys who had firsthand involvement in the settlement negotiations, is to the contrary. And there is no evidence that the Cochran Firm

13

requested Hutchins to engage in these general public relations activities or that they knowingly accepted these services.

"Each party has a duty to present his best case on a motion for summary judgment." *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828 (2) (573 SE2d 389) (2002). And it is well settled that "[a]llegations, conclusory facts, and conclusions of law cannot be utilized to support or defeat motions for summary judgment." (Citation and punctuation omitted.) *Premier/Ga. Mgmt. Co. v. Realty Mgmt. Corp.*, 272 Ga. App. 780, 786 (3) (a) (613 SE2d 112) (2005). Accordingly, we find that Hutchins has failed to produce evidence supporting the two elements of his quantum meruit claim as to the community activities, media interviews, interactions with government officials, or other activities that he asserts created an "atmosphere" conducive to or a "predicate" for a favorable resolution of the Lawsuit. Thus, the trial court properly granted summary judgment as to any claim arising out of such activities. See generally *Insignia/ESG, Inc. v. Reproductive Biology Assoc., Inc.*, 269 Ga. App. 120, 124 (603 SE2d 434) (2004) (summary judgment proper on quantum meruit claim where evidence shows that direct negotiations with third parties, without plaintiff's participation, achieved desired result); *Hollifield*, 251 Ga. App. at 129-130 (2) (b)

14

(even where plaintiff rendered services with an expectation of compensation, where evidence showed no value to the recipient, no implied promise to pay arises).

(b) Nevertheless, the record also contains evidence that Hutchins performed certain, isolated services at the request of Cochran Firm attorneys or employees. In particular, Hutchins testified that he reviewed the wording of Cochran Firm press releases at the firm's request, including the May 1, 2007 release; other evidence indicates that he prepared and/or reviewed drafts of letters or statements written on behalf of Dozier at Sams's request including the April 26, 2007 statement; and Hutchins contends that he appeared at the August 2010 press conference announcing the Estate Settlement at Tiffany Cochran's request. Although the Cochran Firm disputes that it asked Hutchins to perform at least some of this work, the evidence is sufficient to raise a jury issue as to whether such work was performed at the firm's request and/or knowingly accepted by the firm. And evidence that the Cochran Firm may have used Hutchins's work also raises a jury question as to whether the work had value[12] to the firm separate and apart from any value it may have provided to the

_____

[12] We note that Hutchins sent an invoice to the Cochran Firm, which listed his hourly rate for performing such services, which he testified that he had charged at least one other client in the past. Although the appropriate measure of damages is the value to the Cochran Firm, the invoice provides at least some evidence of the potential value of Hutchins's services. Compare *Hollifield*, 251 Ga. App. at 130-131

15

Johnston family or the Estate. See *Langford v. Robinson*, 272 Ga. App. 376, 380 (1) (612 SE2d 552) (2005) (where benefit conveyed was reaped by more than one recipient, each recipient is only liable for the value of the benefit it received). The record evidence also raises an issue as to whether it would be unjust not to compensate him for such work. Moreover, Hutchins's testimony that Sistrunk told him that he "would take care" of him and evidence of the firm's payments to Hutchins raise jury issues as to whether Hutchins performed such work with the expectation that he would be paid by the Cochran Firm. Jury issues also arise as to whether the payments Hutchins received from the Cochran Firm were intended as compensation for this work, and if so, whether such payments provided Hutchins sufficient compensation.

(c) The Cochran Firm asserts, however, that Hutchins admitted in his deposition that he was only expecting to recover under the ten-percent arrangement he had with Dozier. The firm cites Hutchins's testimony that after the Estate

---

(2) (b), (c) (holding that plaintiff's opinion as to the value of his services in providing improvements to land was insufficient on summary judgment for claims of quantum meruit and unjust enrichment where proper measure of value was "the reasonable value of labor and materials of benefit to the recipient or the amount which the improvements added to the fair market value of the land, whichever is the smaller," and plaintiff provided no evidence regarding the fair market value of the land before and after the improvements).

16

Settlement, he contacted one of Dozier's sons to arrange a meeting with Dozier "so I could get the compensation that I agreed to with Ms. Dozier and also from the Cochran Firm, *but I was not seeking to recover any more than Ms. Dozier and I had agreed to.*" (Emphasis supplied by the Cochran Firm in its "Brief of Appellee.") But the very language quoted indicates that Hutchins was looking for compensation from *both* Dozier and the firm. And the highlighted language could be interpreted as indicating that he did not seek to recover an *amount* in excess of ten percent of the Estate Settlement, not that he only expected to recover under his arrangement with Dozier.

We also find no merit to the Cochran Firm's argument that the Dozier Settlement precluded any further recovery against the firm as a matter of law. Although each may have received value from Hutchins's services, any recovery against the Cochran Firm under quantum meruit is limited to the value of any benefit the firm received separate and apart from that received by Dozier. *Langford*, 272 Ga. App. at 380 (1). The Dozier Settlement does not preclude a claim to recover such an amount.

We find, therefore, that the trial court erred in granting summary judgment on Hutchins's quantum meruit/unjust enrichment claim as to the specific work Hutchins asserts he performed at the request of the Cochran Firm.[13]

2. Because we affirm in part and reverse in part the trial court's grant of summary judgment on Hutchins's substantive claim for quantum meruit/unjust enrichment claim, we likewise affirm in part and reverse in part the trial court's grant of summary judgment on Hutchins's claim for attorney fees, which is derivative of that claim. See *Stephen A. Wheat Trust v. Sparks*, 325 Ga. App. 673, 682 (7) (754 SE2d 640) (2014). Accordingly, we reverse the grant of attorney fees as it relates to the claims discussed in subdivision 1 (b) above, and affirm the grant of summary judgment as to any other claim for attorney fees.[14]

---

[13] Audrey M. Tolson, a former Cochran Firm employee, testified that Hutchins's media appearances in another case provided a benefit to the firm because he acted as a buffer between the Cochran Firm and the media. However, Tolson was unaware of whether Hutchins was ever paid in connection with that case. And although Tolson said she had a "general understanding" or "impression" that Hutchins performed a similar role on the Johnston case for which the firm would pay him, she did not work on the Lawsuit and "wasn't involved enough to know specifically what he did." Thus, Tolson did not identify any instances in the Johnston case, other than the August 2010 press conference, in which Hutchins participated.

[14] We note that Hutchins asserts in his reply brief that his claim for quantum meruit/unjust enrichment remains against the Estate. However, we express no opinion on that issue as Hutchins has not demonstrated that he raised the issue below nor has

*Judgment affirmed in part and reversed in part. Phipps, C. J., and Ellington, P. J., concur in the judgment only*.

---

he pointed us to any ruling by the trial court in that regard that would be subject to our review. See *Jackson v. State*, 252 Ga. App. 16, 16-17 (2) (555 SE2d 240) (2001). In any event, this Court will not consider arguments raised for the first time in a reply brief. *Vann v. Finley*, 313 Ga. App. 153, 154, n. 2 (721 SE2d 156) (2011); *Hooks v. Humphries*, 303 Ga. App. 264, 269 (4), n. 8 (692 SE2d 845) (2010). Accordingly, the Cochran Firm's request to file a surreply addressing that issue is denied.