## A04A2340. LANGFORD v. ROBINSON.
### (612 SE2d 552)

SMITH, Presiding Judge.

Sandra Langford appeals from the judgment entered on a jury verdict awarding Virginia Robinson approximately $27,000 in quantum meruit for improvements made to the home once owned by Langford's father, Darnice Malloway. Langford raises two issues in three enumerations of error. She maintains that the trial court erred in failing to grant her motions for directed verdict and judgment notwithstanding the verdict (j.n.o.v.) as to quantum meruit and that the trial court erred in refusing to give her requested charge on quantum meruit. We agree with Langford that the trial court erred in denying her motions, and we reverse the judgment.

The evidence presented at trial showed that before Malloway died, Langford prepared and had her father sign a will leaving his entire estate to her. Malloway also signed a quitclaim deed Langford had prepared, which transferred the house to Langford. Langford witnessed both documents. She admitted that she prepared and had her father execute both documents because of an ongoing feud with her sister, Malloway's other daughter Teresa Kennedy. Langford did not record the deed, nor did she probate the will after her father died. When Kennedy filed a petition to be appointed administrator of the estate, Langford opposed the petition and sought appointment herself. Ultimately, the county administrator was appointed.

Before the administrator was appointed, however, the feud between the sisters escalated. During that time the house stood vacant,[1] and Langford had concerns about being able to procure insurance and pay the taxes. Robinson, an acquaintance of Langford, proposed that Langford sell the house to her. Robinson was aware that the Malloway estate was not yet settled and was aware of the feud between the sisters concerning the house. She was well aware that Kennedy had threatened the previous tenant and had witnessed a portion of the bitter litigation between Kennedy and that tenant. Langford represented to Robinson, however, that she had a deed to the house and that she would be able eventually to sell it to Robinson. Robinson gave Langford a written offer to purchase, and Langford forwarded it to her attorney, with instructions to forward it to Kennedy's attorney for approval. That approval never came.

Nevertheless, Robinson placed her own house on the market and obtained a contract immediately. Because she now needed a place to live, she approached Langford with her proposal to rent the Malloway house for $600 per month until she could buy it, and Langford agreed.

---

[1] Kennedy had evicted the previous tenant in a bitter dispossessory proceeding.

Both knew that the house was in poor shape and that Robinson wanted to improve it. Robinson prepared a rental agreement, which Langford never signed, and another agreement giving Robinson permission to begin making improvements to the house. That agreement, executed in February 2000 by both parties, also recited that "[i]f the sale of the property becomes impossible by December 2000 then Ms. Robinson will be reimbursed for improvements made to the . . . property." Robinson moved into the house and began making extensive improvements, including having carpet and hardwood floors installed, replacing plumbing fixtures, having gutters removed and replaced, having burglar bars removed and replaced with storm windows, and electrical work including replacing light fixtures. Robinson also obtained a termite bond and hired a lawn service. Langford was invited to the house many times, and she saw the improvements but never voiced objection to them.

When the county administrator was appointed in late 2000, Langford turned over to him all the rents she had collected from Robinson. At the administrator's direction, Robinson began remitting the monthly rental to him. She continued to pay rent to the administrator until May 2002, when she moved out.

Some time in 2001, Langford told the administrator about the deed. Of course, if the deed had been valid, the estate would have had no interest in the house. But the dispute between Langford and Kennedy was mediated, and Langford agreed not to insist on the will and quitclaim deed and to permit the house to be treated as an estate asset.[2] In return, the administrator agreed to offer the house for sale to Robinson at a price less than its appraised value. Even so, the estate's asking price was more than the $200,000 Robinson had offered for the house. Robinson and the administrator were unable to come to terms on a sale price, and the administrator placed the house on the market.

Robinson requested reimbursement from Langford for the improvements. When they were not forthcoming, she brought suit against both the estate and Langford, asserting claims for fraud, breach of contract, quantum meruit, punitive damages, and attorney fees. Langford answered pro se. She did not deny leasing the premises to Robinson or giving Robinson permission to make improvements. She claimed only that Robinson had gone overboard without authority in making her improvements. Both before and after the litigation began, the estate took the position that it was not responsible for

---

[2] Langford correctly notes that given the timing and attestation problems, it is reasonable to believe that both the will and the deed were subject to attack as to the legitimacy of the signatures, possible undue influence, and several other problems.

reimbursing Robinson for the work done on the house, claiming that most of the work had been completed before any administrator was appointed and that if an obligation existed, it was solely Langford's responsibility. Robinson agreed to dismiss the estate voluntarily without prejudice once the estate agreed to escrow disputed proceeds. The house was sold to a third party for $286,000, and net proceeds were $235,012.[3] The estate's appraiser testified that Robinson's repairs and improvements had increased the value by approximately $35,000.

More than $135,000 was distributed to Langford and Kennedy. The administrator retained the remaining proceeds to apply to the costs of administration and payment of creditors, with the remainder to be distributed to the heirs. About $92,000 — $102,000 remained to be distributed, including monies escrowed. Langford stands to realize approximately $99,000 from the sale.

Robinson moved for summary judgment against Langford. Langford retained counsel and opposed the motion. The motion was denied, and trial was held in September 2003. At the conclusion of Robinson's evidence, Langford moved for a directed verdict. The trial court directed a verdict in favor of Langford on Robinson's claims for fraud, breach of contract, and punitive damages. The claims for quantum meruit and attorney fees were allowed to go to the jury, resulting in a verdict for Robinson for approximately $27,000 but no attorney fees.[4]

After the verdict was rendered, the trial judge told the parties that he had been "very close to granting the directed verdict yesterday" and had "been second guessing" himself ever since he granted the directed verdict on the contract claim. The judge informed the parties that he believed he had made the correct decision as to that issue, but because he had ruled that the parties did not have a valid contract he now thought he "committed error by allowing this to go to the jury on quantum meruit." He invited Langford to file a motion for j.n.o.v., and requested that both parties brief the issue, adding that he thought "it would be an injustice for me to allow this verdict to stand, given that this is an estate matter." The trial judge went on to state that immediately after he had concluded there was no valid contract, he "should have recognized it is an estate issue, not a personal issue as to the defendant, Miss Langford." Further discussion was held, and the judge reiterated his thinking "that this is a matter of the

---

[3] The estate, however, gave the buyer a credit of approximately $23,000 as a "decorating allowance" and agreed to pay closing costs of about $7,000.

[4] We note that Langford testified at trial that she thought it was "unfair" that she had to reimburse Robinson, and that she thought "the estate should have to pay her."

estate, and I just don't know that I can allow Miss Langford to be individually — given my ruling on the contract, I just feel like I've made an error." Langford filed a motion for j.n.o.v. as directed and both parties submitted briefs. The trial court, however, denied the motion without explanation and entered judgment on the jury's verdict. This appeal ensued.

1. Langford contends the trial court erred in denying her motion for j.n.o.v. We agree both with Langford and with the trial court's stated "second thoughts."

We note initially that we agree with the trial court that the written agreement authorizing Robinson to "begin improvements on the property" was too vague to constitute a valid document, and that we do not agree with Langford's argument derived from *Hollifield v. Monte Vista Biblical Gardens*, 251 Ga. App. 124 (553 SE2d 662) (2001), that Robinson made the improvements as a mere volunteer. *Hollifield* is distinguished from this case because there the plaintiff admitted he was a mere volunteer. Id. at 128 (2). Here, the evidence clearly demonstrates both parties' intent that Robinson be reimbursed for the cost of improvements if she did not purchase the house. Langford admittedly gave Robinson permission to make some improvements. She admitted as much in a letter to her attorney, stating that she had "already signed a lease agreement to purchase with Ms. Robinson to reimburse her all monies spent if she has to move out." Whether Robinson had permission to make some improvements was therefore not a jury issue. The jury had only to decide whether Robinson exceeded the authority given her; whether Langford alone was liable to reimburse Robinson under a theory of quantum meruit; and the amount, if any, required to be reimbursed.

Langford points out correctly that for a plaintiff to recover on a claim for quantum meruit, the jury must find that the plaintiff performed services valuable *to the defendant* and that the defendant accepted those services. When that is shown, a promise is implied to pay the reasonable value of the services. OCGA § 9-2-7; *Nelson & Hill, P.A. v. Wood*, 245 Ga. App. 60, 62 (1) (537 SE2d 670) (2000). She argues that in this case, it is clear that the improvements were performed for the benefit of the estate. We agree.

Contrary to Robinson's argument, whether the repairs were made primarily before the administrator was appointed and whether Langford alone signed the document purporting to reimburse her are not controlling issues. The timing of the improvements is immaterial if a benefit was bestowed upon the recipient. And the trial court concluded correctly that the agreement that includes the promise to reimburse is not a valid contract. Its provisions therefore cannot control.

The obligation to pay for the materials and services rendered arises when the work has value to the recipient; the duty to pay for them arises out of the receipt of a benefit. *Watson v. Sierra Contracting Corp.*, 226 Ga. App. 21, 28 (c) (485 SE2d 563) (1997) (physical precedent only); *Stowers v. Hall*, 159 Ga. App. 501, 502 (3) (283 SE2d 714) (1981). "A party cannot receive and retain the benefit of another's labor without the duty to pay for the reasonable value of the work." (Citations, punctuation and footnote omitted.) *Yoh v. Daniel*, 230 Ga. App. 640, 642 (3) (497 SE2d 392) (1998) (physical precedent only); *Zampatti v. Tradebank Intl. &c. Corp.*, 235 Ga. App. 333, 340 (5) (508 SE2d 750) (1998). The reasonable value of those services is determined from the perspective of the recipient, not by the cost to the party providing them. The finder of fact must determine in what amount the party receiving was benefitted or enriched by the materials and services. Otherwise, a recipient might possibly be liable for services or materials that are ineffective, defective, or even worthless. Id.

Here, the jury has determined the value of Robinson's improvements. The jury decided that Robinson should be reimbursed approximately $27,000 for the improvements, and Robinson has not contested that judgment. Because that amount is within the range of the evidence presented at trial, we will not disturb it. *Cannon Air Transport Svcs. v. Stevens Aviation*, 249 Ga. App. 514, 518 (5) (548 SE2d 485) (2001); see also *Green v. Proffitt*, 248 Ga. App. 477, 478 (1) (545 SE2d 623) (2001).

But Langford did not receive the entire benefit of the improvements made by Robinson; that benefit was reaped by the estate. The estate sold the house for a price that included an increase in its value because of the improvements. Of course, Langford ultimately will receive *some* benefit, but Kennedy will receive an equal benefit from the increased value of the house.[5] Because Langford did not receive a benefit worth $27,000, the trial court erred in denying her motion for j.n.o.v., leaving the entire obligation of reimbursement upon Langford alone. We therefore reverse the judgment and remand this case to the trial court for further proceedings consistent with this opinion.

2. Because we are reversing the judgment, we need not consider Langford's remaining contention.

---

[5] We note that the most efficient way to handle Robinson's reimbursement may be for the estate to pay Robinson as a creditor of the estate. After all payments have been made to all creditors and for all costs of administration, the estate will distribute the remaining proceeds equally to Langford and Kennedy. The estate, however, is not a party to this action, because Robinson dismissed it without prejudice. Neither is Kennedy a party. It is therefore beyond the scope of this appeal to direct that this be done.

*Judgment reversed and case remanded. Johnson, P. J., and Phipps, J., concur.*

DECIDED MARCH 22, 2005 —

*James F. Stovall III*, for appellant.
*J. Patrick McCrary*, for appellee.